IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KAREN BYRD** | : | **CIVIL ACTION** |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| **DANIEL W. JOHNSTON and DAN** | : | **NO. 07-2963** |
| **JOHNSTON, INC.** | : | |
| Defendants. | : | |

DuBOIS, J.                                                                                       MAY 29, 2009

**M E M O R A N D U M**

**I.    BACKGROUND**

In 2005, defendant Daniel W. Johnston ("defendant Johnston") was the sole shareholder, officer, and director of defendant Daniel Johnston, Inc., which owned and operated a General Motors Chevrolet dealership, including service and maintenance and body shop facilities, in Jeannette, Pennsylvania. (Letter of Intent and Confidentiality Agreement ("Agreement") 1, Ex. B to Pl.'s Mot.) On October 24, 2005, defendant Johnston and plaintiff entered into the Agreement, pursuant to which plaintiff was to acquire all of the common stock of defendant Daniel Johnston, Inc., and, thus, the dealership, for a base purchase price of seven hundred thousand dollars ($700,000). (Id. ¶ 2.)

The Agreement provided that on November 7, 2005, plaintiff was to make an initial down payment of seventy-five thousand dollars ($75,000). (Id.) This down payment was non-refundable unless "General Motors Chevrolet Division fails to approve the Buyer as an authorized franchise owner" or unless "the Seller defaults . . . and fails to convey the shares to the Buyer . . . ." (Id.; Johnston Dep. 78:14–21, Dec. 19, 2008.[1]) Plaintiff made the down

---

[1] Plaintiff included excerpts from the transcript of Johnston's December 19, 2008 deposition as Exhibit A to her Motion for Summary Judgment. By letter dated May 21, 2009, the

payment shortly after signing the Agreement.  (Johnston Dep. 69:18–70:4.)

According to the Agreement, closing was to occur on or before February 6, 2006.  (Agreement ¶ 6.)  The parties, however, did not close by that date; the reason for the failure to timely close is currently in dispute.  (Statement of Material Facts in Support of Pl. Karen Byrd's Mot. for Summ. J. ("Statement of Material Facts") ¶¶ 10–11; Johnston Dep. 79:2–15.)  On February 10, 2006, plaintiff's counsel sent a letter to defendant Johnston requesting the return of plaintiff's seventy-five thousand dollar ($75,000) down payment as she had not been approved by General Motors.  (Letter from Robert L. Arangio to Daniel W. Johnston (Feb. 10, 2006), Ex. C to Pl.'s Mot.)  Defendant Johnston received the letter but did not return the down payment.  (Johnston Dep. 86:24–89:19.)

In the summer of 2006, as the closing had still not occurred, defendant Johnston made plans to sell the dealership to Kevin Cook.  (Johnston Dep. 44:19–45:1.)  Defendant Johnston and Cook entered into an Asset Purchase Agreement to effect the transfer of certain of the dealership's assets on July 5, 2006.  (Asset Purchase Agreement, Ex. D to Pl.'s Mot.)  The total purchase price was three hundred thousand dollars ($300,000).  (Id. ¶ 1.1.)  The following day, plaintiff sent a letter to defendant Johnston thanking him for "advising [her] that [he would] be able to make payment of the $75,000.00 deposit to [her] upon conclusion of the sale to a third party."  (Letter from Karen Byrd-Lewis to Daniel W. Johnston (July 6, 2006), Ex. E to Pl.'s Mot.)  At his deposition, defendant Johnston disagreed with this statement, explaining that "that conversation was not you're going to get your $75,000 back.  That conversation was, when am I

---

Court requested the full transcript of the deposition from plaintiff's counsel, and it was provided.  For citation purposes, the Court will refer to the entire transcript as Exhibit A to plaintiff's Motion for Summary Judgment.

getting my $75,000 back? And I said, hey, Karen, when the dust settles and we'll see what position I'm in, if there is $75,000 back, you'll get it." (Johnston Dep. 92:11–16.) Plaintiff's counsel made another written request for the return of the down payment on August 30, 2006. (Letter from Robert L. Arangio to Daniel W. Johnston (Aug. 30, 2006), Ex. F to Pl.'s Mot.)

The Agreement also provided that plaintiff was to serve as interim General Manager of the dealership beginning on November 7, 2005 and continuing through the closing. (Agreement ¶ 5.) Although the parties failed to close by February 6, 2006, plaintiff continued to work as interim General Manager. (Countercl. ¶ 9; Answer to Countercl. ¶ 9.) In the spring of 2006, defendant Johnston discovered that a dealership employee, Ronald Miller, was charging unauthorized purchases to the dealership. (Countercl. ¶ 10; Answer to Countercl. ¶ 10.) These purchases included jewelry and tuition for a member of Miller's family. (Def. Johnston's Answers to Pl.'s First Set of Interrogatories ("Answers to Interrogatories") ¶ 10 & Ex. B.) In response to the unauthorized charges, defendant Johnston terminated Miller. (Countercl. ¶ 12; Answer to Countercl. ¶ 12.) The parties dispute whether plaintiff approved or had prior knowledge of these charges by Miller. The parties also dispute whether plaintiff purchased up to two hundred thousand dollars ($200,000) of direct mail advertising without prior approval during her tenure as interim General Manager.

## II.  PROCEDURAL HISTORY

On July 19, 2007, plaintiff filed a Complaint seeking, *inter alia*, damages and injunctive relief. (Compl. 8.) Jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332 as plaintiff is a citizen of New Jersey and defendants are citizens of the Commonwealth of Pennsylvania, and the amount in controversy exceeds seventy-five thousand dollars ($75,000).

(Id. ¶¶ 2–4.)  The Complaint alleged the following causes of action:

| | |
|---|---|
| Count I | Fraud and Misrepresentation |
| Count II | Conversion |
| Count III | Breach of Contract (and Breach of the Covenant of Good Faith & Fair Dealing) |
| Count IV | Equitable Estoppel |
| Count V | Unjust Enrichment |
| Count VI | Civil Conspiracy |
| Count VII | Assault and Battery |

On September 20, 2007, defendants filed a Motion to Dismiss or Transfer for Improper Venue.  By Order and Memorandum of December 14, 2007, the Court granted in part and denied in part defendants' motion.  Order & Mem. of Dec. 14, 2007; Byrd v. Johnston, No. 07-2963, 2007 WL 4373047 (E.D. Pa. Dec. 14, 2007).  The Court denied the Motion to Dismiss with respect to Counts I through VI of the Complaint and granted the Motion to Dismiss with respect to Count VII (Assault and Battery), dismissing it without prejudice to plaintiff's right to institute suit in a court with jurisdiction over the case and where venue is properly laid.  Order & Mem. of Dec. 14, 2007, at 1.  The Court denied the Motion to Transfer for Improper Venue.  Id.

On January 11, 2008, defendants filed their Answer with Affirmative Defenses and Counterclaim of Defendants, Daniel W. Johnston and Dan Johnston, Inc., to Plaintiff's Complaint.  The Counterclaim alleged three causes of action:  two counts of breach of contract and one count of breach of fiduciary duty.  On February 13, 2008, plaintiff filed Plaintiff Karen Byrd's Answer to Counterclaim of Defendants Daniel W. Johnston and Dan Johnston, Inc.

On March 11, 2008, defendants' counsel filed a Motion of Cozen O'Connor, Thomas B. Fiddler, and John P. Johnson for Leave to Withdraw as Counsel for Defendants Daniel W. Johnston and Dan Johnston, Inc.  In the motion, defendants' counsel stated that defendant

4

Johnston had discharged them and that defendants had not paid outstanding counsel fees. (Mot. to Withdraw ¶¶ 6, 8.) The Court held a hearing on the Motion to Withdraw on July 1, 2008 and granted the motion by Order dated October 8, 2008. At the hearing, the Court explained to defendant Johnston that while he could represent himself *pro se*, he could not represent the corporation, Dan Johnston, Inc. (Mot. to Withdraw Hr'g Tr. 6–8, July 1, 2008.) Defendant Johnston confirmed that he understood the consequences of counsel's withdrawal. (Id.)[2]

On February 19, 2009, plaintiff filed the instant Motion for Summary Judgment seeking entry of judgment in her favor on Count III of the Complaint and Counts I, II, and III of defendant's Counterclaim. By letter to the Court dated March 16, 2009, defendant Johnston requested additional time to respond to the motion in order to seek counsel. On March 17, 2009, by written Order, the Court granted the request and extended the time for response until April 30, 2009. The Order also provided "that in the event *pro se* defendant, Daniel W. Johnston, fails to [respond to the motion], the Court will decide plaintiff's Motion for Summary Judgment on the basis of the record presented." Order of Mar. 17, 2009. Defendant Johnston did not respond to plaintiff's Motion for Summary Judgment, but on May 8, 2009, he filed a document entitled "First Set of Interrogatories" with his answers and supporting exhibits. The Court relies on that submission in ruling on plaintiff's Motion for Summary Judgment.

### III. STANDARD OF REVIEW

A court should grant summary judgment if "the pleadings, the discovery and disclosure

---

[2] The Court also advised defendant Johnston that plaintiff could seek a default judgment against the corporation, Dan Johnston, Inc. unless counsel is retained to represent the corporation. (Mot. to Withdraw Hr'g Tr. 7–8.) To do so, plaintiff must first request entry of default from the Clerk of Court under Federal Rule of Civil Procedure 55(a) and thereafter move for entry of default judgment under Federal Rule of Civil Procedure 55(b).

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). A factual dispute is material when it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007); accord Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim. Fireman's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982) (citations omitted). The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248 (quoting First Nat'l Bank of Az. v. Cities Serv. Co., 391 U.S. 253, 288–89 (1968)).

**IV.    DISCUSSION**

Plaintiff seeks summary judgment on Count III of the Complaint and on Counts I, II, and III of the Counterclaim. This Memorandum will examine each Count in turn.

   **A.    Complaint Count III—Breach of Contract (and Breach of the Covenant of Good Faith & Fair Dealing)**

In her motion, plaintiff argues that she is entitled to summary judgment on Count III of the Complaint because "[t]he record evidence demonstrates unequivocally" that defendants had a

duty under the Agreement to return plaintiff's seventy-five thousand dollar ($75,000) down payment and that defendants failed to do so. (Pl.'s Mot. 8–10.)

Plaintiff's claim that she has a legal right to a refund is based in contract law and relies on a provision in the Agreement:

> [The down payments] shall be non-refundable unless expressly provided for in this Agreement that such amounts are refundable. In the event that the Buyer fails to close or defaults or in any other way fails to acquire all of the issued and outstanding stock of the Company, then these [down payments] shall be forfeited to the Company. *Notwithstanding the foregoing, in the event that General Motors Chevrolet Division fails to approve the Buyer as an authorized franchise owner, then and in only that event, shall the initial seventy five thousand ($75,000.00) dollar advance be returned by the Company to the Buyer. Finally, in the event that the Seller defaults hereunder and fails to convey the Shares to the Buyer, then in that event, the Buyer shall be refunded both seventy five thousand ($75,000.00) dollar advances . . . and all twenty five ($25,000.00) dollar advances . . . .*

(Agreement ¶ 2(A) (emphasis added).)[3]

---

[3] Two other provisions in the Agreement also address the question of when the Buyer's initial advance is refundable. The second provision reads:

> *Unless failure of the Buyer to perform and close hereunder results from a refusal of General Motors Chevrolet Division to approve the transactions described in this Letter of Intent, the one hundred fifty ($150,000.00) dollar initial advances to the Company . . . are non-refundable to the Buyer.* This means that in the event that the Buyer defaults hereunder and fails to acquire one hundred (100%) percent of the common stock of the Company, the Company and the Seller shall have no obligation to return or refund . . . these amounts to the Buyer.

(Agreement ¶ 3 (emphasis added).)

The last iteration, entitled Non-Refundable Initial Deposit, states:

> The initial deposit of seventy five thousand ($75,000.00) dollars . . . tendered by the Buyer to the Company on behalf of the Seller effective November 5, 2005 . . . shall be non-refundable by the Company to the Buyer. In the event that this transaction fails to proceed, or fails to close, for any reason whatsoever, the initial deposit of seventy five thousand ($75,000) dollars . . . shall be non-refundable and Buyer shall have no claim against the Company or Seller relative to the same. *Notwithstanding the foregoing, in the*

Plaintiff argues that, pursuant to the plain language of ¶ 2(A) of the Agreement, she is entitled to a refund of her seventy-five thousand dollar ($75,000) advance because General Motors ("GM") failed to approve her as an authorized franchise owner by the February 6, 2006 closing date and because defendant Johnston defaulted by failing to convey the shares of the dealership on the February 6, 2006 closing date or at any time thereafter. (Pl.'s Mot. 9.) Plaintiff bears the burden of proof on this issue at trial. In support of her argument, plaintiff cites to the deposition of defendant Johnston, in which he testified that the Agreement provided for a refund of plaintiff's down payment in the event that GM failed to approve plaintiff before the closing date. (Johnston Dep. 78:14–79:1.) In response to the question of whether plaintiff had GM approval on the February 6, 2006 closing date, defendant Johnston responded as follows:

> My guess would be no. My reason would be she was dragging her feet. She had things to do from the day of this agreement up until February 6th. She did nothing. Other than going in there as a big shot, brought all her people out from Philadelphia. She had access to all my records, and next thing you know, February 6th came and went. She was nowhere near, she said, ready to close.

(Id. at 79:2–15.) Examining this statement in the light most favorable to defendants, as the party opposing summary judgment, this testimony evidences that plaintiff had duties to fulfill before GM would grant its approval and before closing could occur and that she failed to comply with these obligations. Drawing all inferences in defendants' favor, this would constitute a breach of contract by plaintiff.

---

> *event that the sole reason for the Buyer failing to close is that General Motor Chevrolet Division has failed to approve Buyer as an owner of a General Motor Chevrolet Franchise, then in that event and only, the seventy five thousand ($75,000.00) dollar initial advances shall be refunded by the Company to the Buyer.*

(Agreement ¶ 16 (emphasis added).)

The deposition testimony of defendant Johnston creates genuine issues of material fact as to (a) whether plaintiff had responsibilities with respect to obtaining the approval of GM and preparing for closing, (b) whether she failed to satisfy these responsibilities, and (c) whether GM's refusal to grant approval prior to February 6, 2006 and defendant Johnston's refusal to convey the shares of the dealership were the result of such failure by plaintiff.  The existence of these genuine issues of material fact demonstrates that plaintiff has not, on the present state of the record, established her entitlement to a refund of her seventy-five thousand dollar ($75,000) down payment as a matter of law.  Accordingly, the Court denies plaintiff's Motion for Summary Judgment with respect to Count III of the Complaint, Breach of Contract.

    **B.    Counterclaim Count I—Breach of Contract**

In Counterclaim Count I, defendants allege that plaintiff breached the Agreement by failing to close on the dealership and purchase the stock of Dan Johnston, Inc. (Countercl. ¶¶ 20–23.)  Under Pennsylvania law, the essential elements of a breach of contract claim are "(1) the existence of a contract, (2) a breach of a duty imposed by the contract, and (3) damages." Sullivan v. Chartwell Inv. Partners, 873 A.2d 710, 716 (Pa. Super. Ct. 2005) (citation omitted). At the summary judgment stage, the party with the burden of proof must provide factual support of each of these three elements.

With respect to the first essential element, both parties agree that they entered into a valid contract for the purchase and sale of the dealership, the Letter of Intent and Confidentiality Agreement dated October 24, 2005. (Countercl. ¶ 3; Answer to Countercl. ¶ 3.)  With respect to the second element, as discussed in Part IV.A, *supra*, defendant Johnston testified that plaintiff failed to complete the necessary tasks to allow closing to occur on the scheduled closing date of

9

February 6, 2006. (Johnston Dep. 79:2–15.) He also testified that "the closing never happened on or about February 6th. [Plaintiff] wouldn't close . . . ." (Id. at 75:5–7.) When asked why the dealership stock was never transferred to plaintiff, defendant Johnston explained that "I didn't do the stock because she left, and there was nothing—this thing never transpired. . . . She didn't perform under this agreement as she should have, and that's—I mean, that just why the thing didn't close. And so, no, the stocks weren't conveyed because the closing never occurred." (Id. at 82:10–18.) Examining this testimony in the light most favorable to defendants, as the party opposing summary judgment, and construing all inferences in defendants' favor, the record contains sufficient evidence that plaintiff breached the Agreement to defeat summary judgment on this issue.[4]

---

[4] Plaintiff argues that this claim is barred by ¶ 15 of the Agreement, which states, in relevant part:

> To the extent that [the] negotiations are terminated, no party shall be responsible to any other party for losses, liabilities or expenses associated with the transaction or its proposed completion, or any proposed or pro forma gain on sale or projected gain of any type whatsoever, at such time as the transaction is terminated. This Agreement may be terminated for the following reasons:
> ***
> By the Buyer, if the parties hereto are unable within thirty (30) days to prepare and execute a Stock Purchase Agreement and a Lease Agreement and related agreements to formalize the transaction set forth, or in the event that the results of Buyer's due diligence investigation indicates evidence of degradation in operating and/or financial impact on the future performance of the Assets, Business or Real Estate of the Seller, in comparison with financial results or conditions as previously reported by Seller to Buyer and which formed the basis for Buyer's decision to enter into this Agreement, or upon the discovery by the Buyer or its representatives or designees of any other material misstatement made by any Seller prior to the date of execution of this Agreement, or in the event that General Motors-Chevrolet Division refuses to approve the transfer of ownership as contemplated herein.

This provision does not, on the present state of the record, operate to bar defendants' breach of contract claim. At a future stage, however, plaintiff may be able to prove the

With respect to damages, after plaintiff did not close on the dealership, defendant Johnston entered into a contract on different terms with Kevin Cook.  (<u>Compare</u> Byrd-Johnston Agreement, Ex. B to Pl.'s Mot. <u>with</u> Cook-Johnston Agreement, Ex. D to Pl.'s Mot.)  According to defendant Johnston, the total purchase price that plaintiff agreed to pay was $700,000, while Cook's total purchase price was $300,000.  (Answers to Interrogatories ¶ 14.)  At his deposition, defendant Johnston testified that he offered a lower purchase price to Cook because "I didn't have time to waste.  I was going down.  I needed to sell that property and sell it fast . . . ."  (Johnston Dep. 47:24–48:2.)  This evidence is sufficient to provide factual support on the issue of damages for the purposes of summary judgment.  Accordingly, as the record evidence supports the existence of a contract, breach of that contract by plaintiff, and resultant damages, plaintiff's Motion for Summary Judgment with respect to Counterclaim Count I, Breach of Contract, is denied.

      C.      **Counterclaim Count II—Breach of Contract**

In Counterclaim Count II, defendants allege that plaintiff breached the Agreement by failing to "properly oversee the dealership" and "put forth her best effort" as interim General Manager.  (Countercl. ¶¶ 26, 30.)  In particular, defendants allege that plaintiff did not properly supervise Ronald Miller, an employee who allegedly stole from the dealership during plaintiff's tenure, and that plaintiff caused the dealership to incur over $200,000 in direct mail advertising expenses without approval.  (<u>Id.</u> ¶¶ 27, 28.)

With respect to the supervision of Miller, plaintiff argues that the Agreement did not

---

occurrence of one of the events listed in ¶ 15 that would allow plaintiff to legitimately terminate the Agreement without liability.

make her strictly liable for the acts of dealership employees and that there is no evidence that she had prior knowledge of Miller's activities.  (Pl.'s Mot. 13–14.)  Contrary to the latter assertion, defendant Johnston provided a copy of an email exchange between Miller and plaintiff in which Miller writes to plaintiff that "[y]ou and [I] both know we had full intentions to pay everything off.  [I] did[n't] make one move without your knowledge."  (Answers to Interrogatories, Ex. F.)  Defendant Johnston also provided credit card statements showing that Miller used the company credit card to charge over $1,000 at a jewelry store and to pay tuition for a member of his family.  (Id., Ex. B.)  In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor."  Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007); Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990).  Viewed in defendants' favor, the evidence of record is sufficient to establish genuine issues of material fact as to whether Miller was misusing company funds and whether he was doing so with plaintiff's knowledge.[5]  Accordingly, the Court denies plaintiff's Motion for Summary Judgment with respect to Counterclaim Count II, Breach of Contract.

### D. Counterclaim Count III—Breach of Fiduciary Duty

In Count III of the Counterclaim, defendants allege that plaintiff "owed a fiduciary duty to [defendants] to act in good faith and with the degree of care which a reasonably prudent person in a like position would use in similar circumstances to act in the best interests of Defendants."  (Countercl. ¶ 34.)  Moreover, defendants allege that plaintiff "breached her fiduciary duty by

---

[5] In light of this conclusion, the Court declines to rule on plaintiff's arguments concerning the lack of proof that she made unauthorized advertising expenditures that harmed the dealership.

using her position of Interim General Manager not for the benefit of the dealership, but for the benefit of her business partner, Ronald Miller, and his family.  Additionally, [plaintiff] breached her fiduciary duty by wasting corporate assets . . . ."  (Id. ¶ 35.)  In her motion, plaintiff argues that two alternative grounds support the entry of summary judgment in her favor with respect to Count III of the Counterclaim:  (1) plaintiff, as interim General Manager, did not owe a fiduciary duty to defendants; and (2) defendants have not produced any evidence that plaintiff breached the alleged fiduciary duty.  (Pl.'s Mot. 17.)

        **1.**      **Existence of a Fiduciary Duty**

Under Pennsylvania law, "[a]n agency relationship is a fiduciary one, and the agent is subject to a duty of loyalty to act only for the principal's benefit."  Sutliff v. Sutliff, 528 A.2d 1318, 1323 (Pa. 1987) (citing Restatement (Second) of Agency § 387 (1958)) (further citation omitted); accord Garbish v. Malvern Fed. Sav. & Loan Ass'n, 517 A.2d 547, 554 (Pa. Super. Ct. 1986); In re Shahan, 631 A.2d 1298, 1303 (Pa. Super. Ct. 1993).  "[T]he duty of an agent to his principal is one of loyalty in all matters affecting the subject of his agency, and 'the agent must act with the utmost good faith in the furtherance and advancement of the interests of his principal.'"  Garbish, 517 A.2d at 553–54 (quoting Sylvester v. Beck, 178 A.2d 755, 757 (Pa. 1962)).  When the relationship between the parties is an agency relationship, the agent owes the principal "a fiduciary duty and its conduct must be measured against the standard of care owed by a fiduciary."  Id. at 554; accord In re Shahan, 631 A.2d at 1303.  An agent, as a fiduciary, "is required to act solely for the benefit of his principal in all matters concerned with the agency."  SHV Coal, Inc. v. Continental Grain Co., 545 A.2d 917, 921 (Pa. Super. Ct. 1988), rev'd on other grounds, 587 A.2d 702 (Pa. 1991) (citations omitted).  An agent is also expected to

"exercise the care, skill, and judgment of any ordinarily prudent person under the circumstances." In re Shahan, 631 A.2d at 1303 (citations omitted).

According to the Agreement, "[e]ffective November 7, 2005, and through the date of Closing, [plaintiff] shall begin operating the business of the Company for her own account." (Agreement ¶ 5.) The Agreement further provided that "[d]uring this time period, [plaintiff] shall serve as the interim general manager of the Company." (Id.) Plaintiff concedes that she began working as interim General Manager in or around November 2005. (Statement of Material Facts ¶¶ 27–28.) As interim General Manager, plaintiff assumed management and control of the dealership on behalf of defendants. Pursuant to the Agreement, plaintiff's responsibilities included continuing to operate the dealership in accordance with all applicable laws and regulations. (Agreement ¶ 5.) Plaintiff had to seek prior approval only before making a "non-recurring or out of the ordinary financial, operational, or personnel change . . . ." (Id.) Plaintiff was also "permitted to solicit new business from area banks to provide retail customer financing to customers of the [dealership]." (Id.) Moreover, subject to prior approval, plaintiff was "responsible for the hiring, firing and management of all employees of the [dealership] . . . ." (Id.) At his deposition, defendant Johnston testified that plaintiff "was in effect running the dealership . . . ." (Johnston Dep. 79:23–24.)

Under the Agreement and in practice, defendants entrusted the day-to-day management of the dealership to plaintiff; accordingly, she was acting as their agent. See McDermott v. Party City Corp., 11 F. Supp. 2d 612, 627–28 (E.D. Pa. 1998) (holding that, under Pennsylvania law, an individual who "assumed management and control of [a] store on behalf of [another party]" was that party's agent and fiduciary). As the agent of defendants, plaintiff was their fiduciary

14

and owed defendants "the utmost duties of loyalty and good faith." McDermott, 11 F. Supp. 2d at 628; see also Tyler v. O'Neill, 994 F. Supp. 603, 612 (E.D. Pa. 1998) (holding that "officers and directors of a corporation stand in a fiduciary relationship to the corporation" and that an employee, "as an agent of his employer, is considered a fiduciary with respect to matters within the scope of his agency").

### 2. Evidence of Breach of the Fiduciary Duty

Plaintiff argues that "the summary judgment record contains no evidence that [she] breached [the] alleged [fiduciary] duty." (Pl.'s Mot. 18.) This statement is incorrect. An agent breaches her fiduciary duty when she declines to "act solely for the benefit of [her] principal in all matters concerned with the agency." SHV Coal, 545 A.2d at 921 (Pa. Super. Ct. 1988). Moreover, failing to "exercise the care, skill, and judgment of any ordinarily prudent person under the circumstances" also constitutes a breach of an agent's duty to her principal. In re Shahan, 631 A.2d at 1303. Under Pennsylvania law, an agent's obligation to act in good faith is breached by conduct including "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992) (citing Restatement (Second) of Contracts § 205(d) (1981)).

At his deposition, defendant Johnston testified that plaintiff had committed fraud during her tenure as interim General Manager. (Johnston Dep. 100:22–101:13.) In particular, he testified that while plaintiff was selling a lot of cars, she was manipulating the operating reports to make the profits appear higher. (Id. at 139:14–140:18.) He explained that plaintiff was

15

recording all of the profits but only some of the expenses and hiding other bills. (Id. at 140:19–141:24, 167:15–171:15.) In addition, defendant Johnston testified that plaintiff had full knowledge of the actions of Ronald Miller, an employee who was allegedly stealing from the dealership. (Id. at 161:19–167:11.) In his answers to plaintiff's interrogatories, defendant Johnston repeated his statements that plaintiff's actions were "wrongful, fraudulent, and not in good faith." (Answers to Interrogatories ¶ 10.) As exhibits accompanying his answers, he provided credit card statements showing that Miller used the company credit card to charge over $1,000 at a jewelry store and to pay tuition for a member of his family. (Answers to Interrogatories, Ex. B.) Defendant Johnston also provided a copy of an email exchange between Miller and plaintiff in which Miller writes that he "did[n't] make one move without [plaintiff's] knowledge." (Answers to Interrogatories, Ex. F.)

This evidence presents a genuine issue of material fact as to whether plaintiff breached her fiduciary duty to defendants by committing fraud or by allowing Miller to steal from the dealership. Accordingly, the Court denies plaintiff's Motion for Summary Judgment with respect to Count III of the Counterclaim, Breach of Fiduciary Duty.

V.  **CONCLUSION**

For all of the foregoing reasons, plaintiff's Motion for Summary Judgment is denied. An appropriate Order follows.